# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

_____
                                        )
CONSERVATION LAW FOUNDATION, INC., )
et al.,                                 )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )
                                        )
DEVAL PATRICK et al.,                   )        NO.  06-11295 WGY
                                        )
                                        )
                    Defendants.         )
_____ )

## PLAINTIFFS' TRIAL BRIEF

CONSERVATION LAW FOUNDATION, INC.
CHARLES RIVER WATERSHED ASSOCIATION, INC.
and LEOMINSTER LAND TRUST, INC.

BY:
Christopher M. Kilian
15 East State Street, Suite 4
Montpelier, VT 05602

Cynthia E. Liebman
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

**Counsel for Plaintiffs**

Plaintiffs respectfully submit this trial brief.

## SUMMARY OF EVIDENCE TO BE PRESENTED AT TRIAL

The evidence will show that since early 2004 the Massachusetts Highway Department ("MHD") has submitted several deficient requests for coverage under the U.S. Environmental Protection Agency Region I ("EPA") General Permit covering Small Municipal Separate Storm Sewer Systems ("MS4") in Massachusetts and New Hampshire (the "Permit"). MHD is therefore violating the Clean Water Act ("CWA") twice over; both the deficiencies in MHD's request and all discharges from its drainage system, which are causing or contributing to severe water quality problems throughout the Commonwealth, are violations of the CWA.

The eligibility criteria in the Permit are clear on their face and can be interpreted by this Court, which can determine a discharger's compliance with National Pollutant Discharge Elimination System ("NPDES") Permit requirements by reviewing and interpreting the "plain language" of the Permit terms. Sierra Club v. Young Life Campaign, Inc., 176 F. Supp. 2d 1070, 1082 (D. Colo. 2001). A NPDES Permit remains in effect as originally issued unless formally modified by the Permitting agency. Id. See also 40 C.F.R. § 122.41(f), 122.62, 122.63. Dischargers have an "absolute duty" to comply NPDES Permit terms and remain bound by these terms even where conflicting agency correspondence implies waiver of, or purports to authorize non-compliance with such requirements. See Young Life, 176 F. Supp. 2d at 1081.

The correspondence between EPA and MHD is confusing at best. This allows the Court to simply evaluate the eligibility criteria of the General Permit against MHD's materially deficient SWMP filings. When the Court undertakes its own evaluation of

whether MHD has met the eligibility criteria for Permit coverage, the evidence will show that MHD has failed to submit a materially sufficient SWMP.

Defendants' discharges cause or contribute to instream exceedances of water quality standards that cannot be authorized under the NPDES General Permit.  Gen. Permit at § I.B.2.(k).  Therefore, even if this Court finds that Defendants have obtained authorization to discharge under the General Permit, such authorization would not affect Plaintiffs' claim that discharges exceed the limits imposed by the CWA as a matter of law.  As a result of systemwide violations, MHD is causing widespread and substantial degradation of rivers, streams, and drinking reservoirs throughout the state.

### PLAINTIFFS' WITNESSES

**<u>Dr. Vladimir Novotny, Ph.D., P.E.</u>** – Dr. Novotny is a leading expert on urban and highway storm water runoff.  His expertise spans the fields of hydrology, water pollution and remediation, water quality modeling, and water infrastructure design. Dr. Novotny's textbook, <u>Water Quality: Diffuse Pollution and Watershed Management</u>, is a preeminent resource in the field. Dr. Novotny will offer expert testimony concerning the effects of MHD storm water runoff on water quality in Massachusetts.

**<u>Kate Bowditch</u> –** Ms. Bowditch is the Director of Projects for the Charles River Watershed Association.  In this position, she continually observes the 80-mile long Charles River and its tributaries, documenting pollution problems that plague each section of the river.  Her testimony will concern impacts of nutrients, bacteria and increased turbidity from MHD roadways on water quality standards in the Charles River watershed.

**Peter Angelini** – Mr. Angelini, an avid outdoorsman, has served for many years as the
Chair of the Leominster Land Trust.  As a lifelong resident and watershed advocate, he is
intimately familiar with portions of the Nashua River watershed, including the Nashua
River and Monoosnoc Brook/Pierce Pond system, chronicling pollution problems therein.
He will testify to the effects of polluted storm water runoff from MHD roadways on
water quality in these areas and the negative effects of oil and grease, thermal discharges,
nutrients, floatable trash, and the alteration of sand distribution.

**Joe Farah** – Mr. Farah is a graduate student in engineering at Northeastern University.
He assisted Dr. Novotny on the preparation of Dr. Novotony's study of pollution caused
by MHD storm water runoff. Mr. Farah may offer testimony as to specific aspects of the
modeling and calculations in the report.

### EVIDENCE TO BE PRESENTED AT TRIAL

I.    **Legal Requirements for Authorization Under the General Permit**

    A. **MHD Had An Absolute Duty to Comply with the Clean Water Act by Obtaining a NPDES Permit by May 2003  and Complying with Its Terms**

MHD is required to obtain NPDES Permit coverage for its storm water discharge
drainage system, which has never previously been covered under an NPDES Permit.  The
MHD system is included in the definition provided expressly in the Permit and under 40
C.F.R. §122.26(b)(16)(i) as a small MS4, or a

> . . . separate storm sewer[ ] . . . owned or operated by . . . a State . . .  or
> other public body (created by or pursuant to State law) having jurisdiction
> over disposal of sewage, industrial wastes, storm water, or other wastes. . .

Permit at Part I.B.1.  To obtain coverage under the Permit, MHD was to have filed a
"true, accurate and complete" Notice of Intent (NOI) by May 1, 2003, which it clearly did

not do.  <u>Id</u>. at Part I.E.2.  However, even with timely submittal of a "true, accurate and complete" NOI, "[t]he authorization to discharge begins on the date of receipt of EPA's written authorization."  <u>Id</u>. at Part I.B.4.  Further, "if a late NOI is submitted, authorization is only for discharges that occur after the Permit coverage is granted," rendering all past and current violations illegal.

### B.  The Eligibility Criteria of the Permit are Plain on Their Face and Can Be Applied by the Court to Determine MHD's Coverage

The General Permit includes specific eligibility criteria that describe authorized discharges, developed under a statutory mandate requiring adequate regulation of storm water discharges to protect water quality.  Permit at Part I.B.2.  CWA § 402(p)(6), 33 U.S.C. § 1342(p)(6).  The Permit language is clearly articulated and provides readily identifiable standards against which to evaluate Permit coverage.  If a discharge is "not eligible for this Permit, [the operator] must apply for an individual or alternative NPDES general permit."  Permit at Part I.B.2.l.  Unless and until the MS4 system meets the eligibility criteria or is covered under another NPDES Permit, the discharges are occurring without Permit coverage in violation of the CWA.  Permit at Part I.E.5.

A district court may find that defendants who commence activities without meeting the eligibility criteria of a General Permit violate the CWA for discharging without a Permit.  <u>Molokai Chamber of Commerce v. Kukui, Inc</u>., 891 F. Supp. 1389, 1399-1340 (D. Haw. 1995).  MHD has not met clear eligibility criteria for Permit coverage.  The Court should determine that MHD is therefore excluded from Permit coverage at this juncture, that MHD's discharges are occurring without a CWA Permit in violation of the CWA, and should enter judgment in favor of the Plaintiffs.

C.  **40 C.F.R. 122.4 Requires that General Permit Excludes Discharges In Violation of State "Antidegradation Policy" and Creation of Compliance Schedules for Other Dischargers**

The General Permit explicitly provides that the EPA cannot authorize discharges prohibited under 40 C.F.R. § 122.4, including "discharges not in compliance with the state's antidegradation policy." Permit at Part I.B.2(i).  Subsection (i) of Section 122.4 prohibits any new discharge into a water segment that does not meet applicable water quality standards and for which a pollutant load allocation has been performed pursuant to the Antidegradation Policy.  See 33 U.S.C. § 1313.  40 C.F.R. § 122.4(i); see Friends of Pinto Creek v. EPA, 504 F.3d 1007, 1011-13 (9th Cir. 2007).

The regulation does provide an exception, subject to two conditions.  First, the applicant, or "new discharge" must demonstrate that sufficient pollutant load allocation remains to allow for the discharge under existing circumstances, taking account of all sources of pollution, while meeting state water quality standards.  40 C.F.R. § 122.4(i)(1);  Friends of Pinto Creek, 504 F.3d at 1013.  Second, the new discharge must show "existing" discharges into the water segment "are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards." 40 C.F.R. § 122.4(i)(2).  This plain language demands the adoption of compliance schedules that account for discharges from all existing sources.  Friends of Pinto Creek, 504 F.3d at 1013-14.  Absent a showing sufficient to bring the new discharger under the terms of the exception allowed under 40 C.F.R. § 122.4(i), the new discharge is ineligible according to the express terms of the General Permit.

The evidence in this case will show that MHD's system falls within the definition of "new discharge" because the system has not previously obtained, or been subject to,

NPDES Permit coverage.  Total Maximum Daily Load limitations ("TMDL's") have been completed for certain waters that receive MHD discharges.  However, MHD  has not performed the Antidegredation analysis to demonstrate that there is adequate loading capacity to accommodate its discharges into these waters or that other sources of the pollutants of concern are currently subject to compliance schedules that would satisfy the EPA regulations.  In fact, the evidence shows that loading capacity is not currently available and that other discharges are not on compliance schedules.  Furthermore, MHD's inadequate, draft storm water management plan (SWMP) admits that the system discharges into numerous waters that are "impaired" but also that TMDLs have not yet been prepared and no compliance schedules have been developed.  MHD has made no apparent effort to satisfy the demonstration required by 40 C.F.R § 122.4(i) for these discharges and therefore is ineligible for coverage under the General Permit.

Similarly, MHD bears an affirmative burden to demonstrate that it has satisfied the Antidegradation Policy adopted by Massachusetts as part of its surface water quality standards.  See 314 Code Mass. Regs. 4.04.  The Antidegradation Policy places specific affirmative obligations on MHD to demonstrate compliance by showing that:

1.  The discharge is necessary to accommodate important economic or social development in the area in which the waters are located;

2.  No less environmentally damaging alternative site for the activity, receptor for the disposal, or method of elimination of the discharge is reasonably available or feasible;

3.  To the maximum extent feasible, the discharge and activity are designed and conducted to minimize adverse impacts on water quality, including implementation of source reduction practices; and

4.  The discharge will not impair existing water uses and will not result in a level of water quality less than that specified for the Class.

314 CMR § 4.04(5)(a)(1-4). There is no evidence that MHD has conducted any of these analyses, rendering its discharges in violation of the Antidegradation Policy.

**II.     MHD Has Failed to Meet The Eligibility Criteria for Permit Coverage, And Is Therefore In Violation of the Clean Water Act, System-wide**

The evidence in this matter shows that MHD has not met the eligibility standards for Permit coverage, and the Clean Water Act places a burden of "absolute compliance" on dischargers who are required to obtain a NPDES Permit. To be validly covered under the Permit, MHD must meet express eligibility standards set forth in the Permit. These standards are plain on their face and can be readily assessed by the Court. MHD is ineligible for Permit coverage because it has abysmally failed to meet the minimum eligibility requirements for Permit coverage.

In fact, despite the fact that MHD was fully aware of its obligation to obtain Permit coverage well in advance of May 1, 2003, MHD has not yet submitted a "true, accurate, and complete" SWMP. Although MHD's failure to meet this standard alone is enough for the Court to find that MHD is discharging without coverage under an NPDES Permit, many other clearly articulated eligibility standards have not been met as set forth below. The Court should conclude that MHD is discharging without coverage under a valid NPDES Permit, and is therefore in continuing violation of the Clean Water Act.

**A. MHD is Ineligible for Permit Coverage Because MHD Has Not Submitted a SWMP that Meets the Eligibility Criteria of the Permit**

The Permit repeatedly affirms that MHD may validly discharge under the Permit only if MHD has submitted a SWMP. MHD has to date not submitted a complete SWMP. Therefore, the Court can readily determine that MHD has not met this standard and is discharging without coverage of its system.

The Permit explicitly states that authorization applies to "only [small MS4 dischargers] . . . who submit a Notice of Intent and a [SWMP] in accordance with Part I.E. of this Permit and obtain written authorization from EPA . . . ." Permit at 2. The Permit later describes a Permittee's responsibility to satisfy statutory mandates and water quality standards by developing a SWMP "implementing the minimum measures described in Paragraph V.B" by the Permit's expiration date. Id. at Part V.A.1–2.

The straightforward statements in the Permit are entirely consistent with the underlying regulatory framework controlling the Court's consideration of this matter. Without an approved SWMP in place, MHD is not eligible for a Permit to discharge under the EPA Region I General Permit. See 40 C.F.R. § 122.28(b)(2). The SWMP is the heart of compliance with the Phase II regulation and the MS4 program. 40 C.F.R. § 122.34(a) ("Your NPDES MS4 Permit will require at a minimum that you develop, implement, and enforce a SWMP designed to reduce the discharge of pollutants from your MS4 to the maximum extent practicable (MEP), to protect water quality, and to satisfy the appropriate water quality requirements of the Clean Water Act.").

**B.  MHD is Ineligible for Permit Coverage Because MHD Has Not Submitted an NOI that Meets the Eligibility Criteria for Coverage Under the Permit.**

The Permit requires that MHD may validly discharge under the Permit only if it has submitted an NOI that meets specific standards. This is first stated under the heading "Authorization to Discharge under the National Pollutant Discharge Elimination System." Permit at 2. Under the heading "Eligibility Criteria" the Permit again states that "[t]he Permittee is authorized to discharge under this Permit if: . . [t]he Permittee submits a Notice of Intent in accordance with Part I.E. of this Permit . . . ." Permit at Part I.B.1.d. Part I.E. of the Permit reiterates the requirement that an NOI must be submitted and

describes the substantive components that must be included in the NOI.  MHD's NOI

excludes much of the specific information required by this section.  Thus, MHD has not

satisfied the criteria to be eligible for Permit coverage.

Part I.E.1.d. requires that an NOI "identify all known waters that receive a

discharge from the MS4 [and,] [i]f known, indicate the number of outfalls to each water."

MHD possesses data and documentation on all waters into which its MS4 discharges.

Further, MHD knows the number of outfalls to each water.  Nevertheless, MHD has

failed to submit information to satisfy this eligibility criterion.

Part I.E.1.g. requires MHD to submit its SWMP by identifying "best management

practices for each minimum control measure described in . . . Part V.B(1-6)."  Permit at

Part V.A.1 ("The Permittee must develop a SWMP implementing the minimum measures

described in Paragraph V.B.")  MHD has not completed a SWMP that includes this

required information.  Furthermore, MHD has not submitted the information required by

Part V.B(1-6).

**C.    MHD is Ineligible for Permit Coverage Because the MHD SWMP Does not
       Include a Description of the BMPs that Will Be Used to Ensure that MHD
       Will Not Contribute to Instream Exceedances of Water Quality Standards.**

The Permit sets forth specific "Eligibility criteria."  Permit at Part I.B.  Under this

heading, the Permit includes a section detailing that "[t]he following storm water

discharges <u>are not authorized</u> by this Permit," and setting forth specific categories of

excluded discharges and specific requirements for Permittees.  <u>Id</u>. at Part I.B.2 (emphasis

added).  Included in the list of "discharges not authorized by this Permit" are

"[d]ischarges that would cause or contribute to instream exceedance of water quality

standards."  <u>Id</u>. at Part I.B.2.k.  To satisfy this <u>eligibility criterion</u> the Permit requires that

"[t]he [SWMP] <u>must include a description of the BMPs that will be used to ensure that this will not occur</u>." <u>Id</u>. (emphasis added.)[1]

MHD's obligations to demonstrate that this eligibility threshold is met are further illuminated in the Permit. In a section entitled "Discharges to Water Quality Impaired Waters" the Permit requires the Permittee to "determine whether storm water discharges from any part of the MS4 contribute, either directly or indirectly, to a 303(d) listed water body." <u>Id.</u> at I.C. Additionally,

> [t]he SWMP must include a section describing how the program will control the discharge of the pollutants of concern and ensure that the discharges will not cause an instream exceedance of the water quality standards. This discussion must specifically identify control measures and BMPs that will collectively control the discharge of the pollutant(s) of concern. Pollutant(s) of concern refer to the pollutant identified as causing the impairment.

<u>Id</u>. at Part I.C.

The SWMP does not include a section describing how the program will control discharge of pollutants of concern. In fact, MHD's submissions are entirely devoid of specific identification of control measures and BMPs that will collectively control the discharge of pollutants of concern. Generalized statements and vague references should not be condoned by the Court as adequate. To the extent that MHD has discussed implementation of BMPs to rectify exceedances of water quality standards, the statements in the SWMP are vague and cannot possibly ensure that contribution to exceedances will not occur. MHD has failed to complete the required analyses and determinations to satisfy the eligibility criterion. MHD's discharges, therefore, are not covered by the Permit. MHD is discharging without Permit coverage in violation of the Clean Water Act.

---

[1] EPA has the authority to require strict compliance with state water quality standards. <u>Defenders of Wildlife v. Browner</u>, 191 F.3d 1159, 1166 (9th Cir. 1999).

Appropriately, MHD must meet a high burden to satisfy the Permit requirement that its SWMP must <u>ensure</u> that contribution to exceedances <u>will not</u> occur. To construe this obligation, the court can turn to the ordinary meaning of the term "ensure." <u>Textron Inc. v. Comm'r of Internal Revenue</u>, 336 F.3d 26, 31 (1st Cir. 2003) ("[I]f the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as written.") The Webster's New Universal Unabridged Dictionary defines "ensure" as "to secure, or bring surely, as a person . . . [or] . . . to make sure or certain . . . ." Pursuant to this common definition, MHD is obligated to demonstrate that its SWMP will make sure or certain that it will not contribute to any exceedances of water quality standards – a guarantee that such conditions will not occur. MHD has failed to meet this standard. There is simply no record evidence that MHD's SWMP ensures that its pollution will not enter into the polluted waters of the Commonwealth. In fact, the record indicates that MassHighway contributes to violations and that these violations will continue. Without this guarantee, MHD is excluded from coverage under the Permit. The discharges from its system are not authorized by the Permit and they violate the Clean Water Act.

Plaintiffs' evidence and MHD's own submissions demonstrate that MHD's system contributes to exceedances of water quality standards, including discharges to numerous 303(d) listed waters. Yet, MHD provides nothing more than a loose description of the location of 303(d) listed waters that are the unfortunate recipients of pollution from its drainage infrastructure. To the extent that MHD has identified these waters, the only indication that can be drawn from the MHD submissions is that MHD discharges to numerous impaired waters.

These waters are identified pursuant to section 303(d) of the CWA because they are the most polluted waters in the Commonwealth.  By definition, these waters do not meet even the minimum standards of water quality adopted by the state and approved by EPA.  Essentially, these waterways are in crisis; they no longer have the capacity to assimilate pollution discharges from MHD's (or any other) discharge system.

From a public policy perspective, it makes great sense to exclude discharges to such waters from General Permit coverage, and to require coverage under a more stringent individual permit, unless and until adequate remediation plans are developed with discernable implementation commitments that will ensure the elimination of contribution to these pollution problems.  Absent such an approach, additional pollution discharges will continue to occur.

**D. MHD is Ineligible, and Has Failed to Satisfy a Requirement to Remain Eligible, for Permit Coverage Because MHD Has Not Demonstrated that Its Discharges Will be Consistent with Applicable TMDLs by Incorporating Limitations, Conditions, and Requirements into the SWMP at the Time of Submission of the NOI.**

The Permit sets forth specific "Eligibility Criteria."  Permit at Part I.B.  Under this heading, the Permit includes a section detailing that "[t]he following storm water discharges are not authorized by this permit," and setting forth specific categories of excluded discharges and specific requirements for permittees.  Id. at Part I.B.2 (emphasis added).  Included in the list of "discharges not authorized by this permit" are: "[d]ischarges of any pollutant into any water for which a Total Maximum Daily Load (TMDL) has been established or approved by the EPA unless the discharge is consistent with the TMDL.  This eligibility condition applies at the time of submission of the NOI."

Id. at Part I.B.2.l.[2]  Specifically, the Permit states that discharges are not authorized if they are made into "any water for which a [TMDL] has been established or approved by EPA unless the discharge is consistent with the TMDL."  Id.

While MHD has recognized that it discharges into many waters for which a TMDL has been established, it has not demonstrated that its discharges are consistent with these TMDLs.  It is impossible to discern from the record that MHD has conducted any meaningful analysis of the steps and measures necessary to satisfy this eligibility criterion of the Permit, much less any indication that MHD could possibly be successful in implementing such steps and measures by the end of this Permit term.  MHD has not met the express eligibility criterion for coverage under the Permit.

The Permit makes clear that continued eligibility is conditioned upon mandatory incorporation into the SWMP of any limitations, conditions and requirements applicable to discharges authorized by this Permit.  Thus, even if MHD at one time could have been construed to have satisfied the eligibility criteria (which they have not) MHD has not incorporated any specific "limitations, conditions and requirements" into the SWMP – such measures simply do not exist in the MHD submissions.  In addition, there is no indication of enhanced monitoring or reporting requirements applicable to such waters.

The eligibility criterion incorporates Part I.D. of the Permit as a basis for evaluating eligibility for Permit coverage.[3]  Part I.D. of the Permit is entitled "Total

---

[2] Section 303(d) of the CWA requires that the Commonwealth must identify waters whose quality does not meet the standards of quality established by the state under the Clean Water Act.  33 U.S.C. § 1313(d). This identification must be approved by EPA.  Once these polluted or "water quality limited" waters are identified, the Commonwealth must develop a TMDL for the waterway that limits the amount of pollution entering the waters to a level that will meet water quality standards.  The TMDL developed by the Commonwealth must be submitted to, and approved by, EPA.  If EPA does not approve the TMDL, EPA must then complete an adequate TMDL for the waters within 30 days of the disapproval. Id.  These provisions of the CWA are the primary means of ensuring that polluted waters are effectively cleaned up.

Maximum Daily Load Calculations" and sets forth several critical mandatory obligations that MHD has simply failed to meet.

First, the Permit requires that "[i]f a TMDL has been approved for any water body into which the MS4 discharges, the permittee must. . . [d]etermine whether the approved TMDL is for a pollutant likely to be found in storm water discharges from the MS4." Permit at Part I.D.1.  The record is devoid of any such comprehensive determination despite MHD's recognition that its system discharges into numerous waters for which a TMDL has been approved.  In fact the only such analysis submitted in this matter has been prepared by Plaintiffs and unequivocally demonstrates not only that these TMDLs are for pollutants "likely to be found in storm water discharges from the MS4," but that, in fact, these pollutants are found in MHD's discharges. Furthermore, MHD has admitted that these pollutants are discharged from its system.  Thus, MHD has failed to conduct the required determination and cannot therefore justify eligibility for Permit coverage.

Second, the Permit requires that, to discharge into TMDL-approved waters, MHD must "[d]etermine whether the TMDL includes a pollutant waste load allocation ("WLA"), BMP recommendations or other performance requirements for storm water discharges." Permit at Part I.D.2.  Rather than undertaking the required determination, MHD simply lists a small portion of the numerous waters for which a TMDL has been prepared.  MHD has listed only those waters for which the TMDL specifically mentioned MHD as a significant source of the impairment – and even here, MHD has essentially refused to commit to any particular actions that will ensure the WLA is met.  Again,

---

[3] Permit Part I.B.(l) requires reference to Part I.D. for harmonization of the Permit's TMDL-related standards.

MHD has failed to conduct the required determination and cannot therefore justify eligibility for Permit coverage.

Third, the Permit requires that, to discharge into TMDL-approved waters, if MHD is required to implement storm water WLA provisions of the TMDL, it must "assess whether the WLA is being met through implementation of existing storm water control measures or if additional control measures are necessary." Permit at Part I.D.3. This assessment "is expected to focus on the adequacy of the permittee's storm water controls (implementation and maintenance), not on the response of the receiving water." Id.

MHD has not fulfilled these obligations for Permit coverage. At a minimum, MHD's dismissively short list of TMDL-regulated waters fails to list TMDLs established for both the Lower Charles River Basin and the Neponset River Basin. Final TMDL Reports for the Lower Charles River Basin and the Neponset River Basin, *available at* http://www.mass.gov/dep/water/resources/tmdls.htm#charles. MHD fails to include these waters in its SWMP despite the fact that its MS4 discharges into both. Because these waters, along with many others, are not even identified by MHD, it cannot possibly address the measures necessary to restore their integrity.

Fourth, the Permit requires that, to discharge into TMDL-approved waters, a Permittee must:

> [h]ighlight in the [SWMP] and annual reports all control measures currently being implemented or planned to be implemented to control pollutants of concern identified in approved TMDLs. [They also must] include a schedule of implementation for all planned controls [and d]ocument the assessment which demonstrates that the WLA will be met including any calculations, maintenance log books, or other appropriate controls.

Permit at Part I.D.4.  MHD fails to provide an implementation plan specific to the TMDL waters.  MHD has also not fulfilled its obligations to document any assessment to demonstrate that applicable WLAs will be met, let alone calculations, log books, or other controls.  Because of these consistent and systematic failures, MHD has not fulfilled these obligations necessary to justify eligibility for Permit coverage.

### E.  To Maintain Eligibility, MHD is Required to Complete Full Implementation of the SWMP by May 2008

The Permit expressly requires that "[a]ll elements of the [SWMP] must be implemented by the expiration date of this permit."  Permit at Part V.A.2.  The Permit, and any authorization to discharge under it, expires at midnight on May 1, 2008.  Id. at 2.  MHD's failure to develop even the basic compliance materials to meet the Permit's eligibility criteria has rendered this requirement of the Permit a nullity.  MHD's delay and incomplete filings have resulted in years of polluted discharges from its system in violation of the Clean Water Act.  Instead of 5 years of progress toward eliminating pollution discharges, MHD's neglect of its responsibilities has resulted in continuing and further degradation of the state's cherished and important waters.  The Court should conclude that MHD's neglectful approach to Clean Water Act compliance does not satisfy the minimum eligibility criteria of the Permit and, therefore, MHD is facially ineligible for Permit coverage.

### III.    The Evidence Will Show That MHD's Discharges Cause or Contribute to Instream Exceedances of Water Quality Standards

The evidence will show that that the effluent in MHD's discharges exceeds water quality criteria for pollutants of concern and causes or contributes to instream exceedance of water quality standards in water bodies throughout Massachusetts.  Plaintiffs' expert

witness, Dr. Vladimir Novotny, Ph.D., P.E., concluded in his Expert Report that based on his years of study of highway pollution, and his specific study of MHD runoff, there is a very high likelihood that several pollutants from highways in the MHD system contribute to exceedances of state water quality standards.  Dr. Novotny analyzed exceedances of standards for three toxic metals at four sites that are representative of highly traveled highways in Eastern Massachusetts. He found that storm water discharges from MHD's system was very likely to be causing instream exceedances of water quality standards for three toxic metals at three sites, and likely to be causing instream exceedances of water quality standards for three metals at the remaining site.

The evidence presented by Dr. Novotny will also show that in winter conditions, very high application rates of de-icing agents are used for snow and ice control, resulting in high loads of pollutants. His testimony will show a high degree of certainty that these pollutant loadings cause instream exceedances of water quality standards for salinity, chlorides, and sodium, and likely cause or contribute to exceedances for cyanides.

Defendants may contend that Plaintiffs' expert's methodology is unreliable and not admissible.  However, evidence will show that Dr. Novotny's analysis was based on reliable data and methodologies and applied such data and methods in a reliable and replicable manner.  In particular, his testimony will highlight the conservative assumptions made at each juncture and the sensitivity analysis in his report that ensured the reliability of the results.  As his testimony will show, the structure of Dr. Navotny's study was based on his years of experience in water quality analysis, and his approach was methodical and complete. In contrast, Defendants' expert, Dr. Ostendorf, will reveal

that he conducted only a cursory analysis of portions of Dr. Novotny's report, and that his professional background lacks the breadth of Dr. Novotny's.

Testimony by witnesses Kate Bowditch and Peter Angelini will demonstrate that, at particular locations within the watersheds with which they are familiar, MHD's discharges cause or contribute to exceedances of water quality standards. Based on personal observation of the watersheds, they will testify as to exceedances of standards for a number of pollutants such as oil and grease, bacteria, sand, salt, trash and other floatables, thermal discharges, and turbidity. In addition, their testimony will show that these pollutant loadings contribute to impairments of the uses for which the water bodies are intended.

## REMEDIES ARE WARRANTED BY THESE VIOLATIONS

### I.    MHD's Violations of the Clean Water Act Are Causing Harm to the Environment

Dr. Novotny's conclusions show that MHD roads cause or contribute pollution to the Charles River, the North Nashua River, and the Cambridge drinking water supply at levels that cause harm to aquatic life. Additionally, testimony by Dr. Novotny, Kate Bowditch, and Peter Angelini will show that recreational uses of numerous waterways throughout Massachusetts are impaired by pollution discharged from the MHD separate storm sewer system. MHD's own NOI and SWMP submissions reveal that its storm sewer system discharges into scores of waters that are listed by the Commonwealth of Massachusetts as "impaired" by the types of pollutants commonly found in highway runoff. "Impairment" means by definition that the intended uses are not able to be met because of pollution problems. See 314 C.M.R. § 4.00. Thus, as the evidence will show, when pollutants wash off of MHD roadways through drainage systems designed to

convey the water into rivers and streams, those waters become even more polluted and their uses less likely to be met.

## II.    Injunctive Relief Is the Appropriate Remedy

Plaintiffs continue to seek an order from the Court that Defendants are in violation of the Clean Water Act and the General Permit, and requiring MHD to complete its NOI and SWMP and other requirements for authorization, to take specific measures to address its unauthorized discharges by a date certain, and to cease discharges that cause or contribute to instream exceedances of water quality standards. This order would include among other elements, a requirement that by a fixed date or dates, MHD must create separate, enforceable plans with specific tasks and deadlines to 1) identify and eliminate discharges that cause or contribute to instream exceedance of water quality standards, 2) comply with requirements of Total Maximum Daily Load reports, and 3) identify and clean up discharges to impaired waters;  identify specific, enforceable measures, with deadlines, it will take to reduce harmful de-icing agent pollution; identify specific, enforceable measures, with deadlines, it will take to protect drinking water supplies system-wide; and complete all other revisions to its NOI and SWMP required in EPA's correspondence.

Defendants may attempt to demonstrate that MHD is either already using some BMPs to control storm water runoff, or that they should not adopt those BMPs. Testimony during trial will show that numerous BMPs, unused by MHD, effectively remove the types of pollutants found in highway runoff. Testimony will also demonstrate that MHD has not taken significant, systematic measures to reduce pollution from its runoff using the current knowledge of these BMPs. Finally, testimony will show that it is impossible

for MHD to meet the Permit's standards concerning discharges to impaired waters without implementing BMPs on a scale well beyond any that may currently be in place.

Plaintiffs continue to seek an order from the Court requiring MHD to address its unauthorized discharges by a fixed date, imposing monetary penalties as sanctions for noncompliance, and providing declaratory relief. As described above, MHD's stormwater discharges have not been authorized. Moreover, EPA has taken only faltering steps to address MHD's long history of noncompliance and environmentally damaging discharges. (See Compl. ¶¶ 26-31.) This Court has broad discretion to order effective relief. See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 192 (2000) ("[u]nder [the citizen suit provision], the district court has discretion to determine which form of relief is best suited, in the particular case, to abate current violations and [to] deter future ones.")[4]

Respectfully submitted,

CONSERVATION LAW FOUNDATION, INC.
CHARLES RIVER WATERSHED ASSOCIATION, INC.
LEOMINSTER LAND TRUST, INC.

By:    /s/ Christopher M. Kilian
       Christopher M. Kilian, admitted pro hac vice
       Conservation Law Foundation, Inc.
       15 East State Street, Suite 4
       Montpelier, Vermont 05602
       ckilian@clf.org; (802) 223-5992

                                    Dated:   February ____, 2008

---

[4] See also Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc., 73 F.3d 546, 579 (5th Cir. 1996) Cert. denied, 519 U.S. 811, 117 S.Ct. 57, (Oct. 7, 1996) (enjoining unpermitted discharges and issuing compliance order); United States Pub. Interest Research Group v. Atl. Salmon of Me., LLC, 339 F.3d 23, 31, 33 (1st Cir. 2003) (relief might include injunction to remedy past harm because "once a citizen suit is brought and establishes a present violation, there is nothing in the statute or in Gwaltney that prevents a court from ordering equitable relief to remedy the harm done in the past," as long as "a district court does not reduce the environmental protection provided by the [post-complaint] Permit") (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982); Gwaltney v. Chesapeake Bay Found., 484 U.S. 49 (1987); Natural Res. Def. Council v. EPA, 996 F.2d 1292, 1299-1300 (9th Cir. 1992) (declaratory relief proper even if injunctive relief is not).