UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC. et al., <br><br> Plaintiffs, <br><br> v. <br><br> DEVAL PATRICK, in his official capacity as GOVERNOR OF MASSACHUSETTS; and <br><br> JEFFREY B. MULLAN, in his official capacity as SECRETARY OF TRANSPORTATION AND CHIEF EXECUTIVE OFFICER, MASSACHUSETTS DEPARTMENT OF TRANSPORTATION; and <br><br> LUISA PAIEWONSKY, in her official capacity as ADMINISTRATOR OF THE MASSACHUSETTS DEPARTMENT OF TRANSPORTION, HIGHWAY DIVISION, <br><br> Defendants. | No. 06-11295 (WGY) |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' DECEMBER 23, 2009 REVISED STORM WATER MANAGEMENT PLAN AND JANUARY 29, 2010 STATUS REPORT**

Pursuant to the Court's Order of December 31, 2009, Plaintiffs hereby submit this Supplemental Memorandum In Opposition to Defendants' December 23, 2009 Revised Storm Water Management Plan and January 29, 2010 Status Report ("Supplemental Memorandum") for the Court's consideration. Plaintiffs also submit two expert reports prepared by Tom Schueler evaluating Defendants' December 23, 2009 Storm Water

1

Management Plan (the "Revised SWMP") and January 29, 2010 submission.[1] (Exhibits 1 and 2).

## I. DEFENDANTS REMAIN NON-COMPLIANT WITH PERMIT AND COURT RULINGS, AS CONFIRMED BY SCHUELER REPORT AND DEFENDANTS' STATUS REPORT

On December 23, 2009, Plaintiffs filed an extensive motion (the "Opposition Motion") outlining the substantial deficiences in Defendants' Revised SWMP along with a Proposed Order to compel the necessary steps toward compliance with Defendants' legal obligations (the "Proposed Order"). (Dkt. Nos. 93-94.)[2] Specifically, Plaintiffs observed that the Revised SWMP does not comply with the Court's Findings and Rulings because it:

> (1) is not based on the USGS Study and Model as represented by Defendants at trial;
>
> (2) defies the Court's Order to correct instream exceedances of water quality standards at three sites – one in Lancaster along Route 190 and two along Route 495 adjacent to the Charles River (collectively, the "Three Sites");
>
> (3) fails to address discharges to all impaired waters as required by section I.C.2 of the General Permit;
>
> (4) specifies neither structural best management practices ("BMPs") that Defendants will use to control discharges of pollutants of concern to impaired waters nor an approach to measuring the effectiveness of any such BMPs;
>
> (5) improperly narrows consideration of waters with a Total Maximum Daily Load ("TMDL") to a limited fraction of waterways; and

---

[1] Mr. Schueler's qualifications have already been presented to the Court and Defendants, and his testimony provided a basis for the Court's May 30, 2008 Findings and Rulings (the "Findings and Rulings"). See Docket No. 65-2.; Findings and Rulings, May 30, 2008.

[2] Plaintiffs continue to maintain all objections to Defendants' December 23, 2009 submission identified in the Opposition Motion and its supporting documentation and, to avoid undue repetition, incorporate them herein by reference.

(6) lacks any time frame for implementation of necessary BMPs.

On December 31, 2009, the Court granted Plaintiffs' alternative motion to make supplemental submissions regarding these deficiencies. Accordingly, Plaintiffs submit Mr. Schueler's independent expert analysis of Defendants' recent filings. In his first report, Mr. Schueler concludes that none of Defendants' minimal revisions to its SWMP will correct the deficiencies the Court identified in its Findings and Rulings. See Exhibit 1. In his second report, Mr. Schueler explains why the AECOM model Defendants use to support their position that, despite the Findings and Rulings, no remediation is needed at the Three Sites, is patently unreliable and, therefore, should be disregarded. See Exhibit 2.

Moreover, the Defendants' own January 29, 2010 submission effectively concedes many of the points raised in Plaintiffs' initial Opposition Motion – in particular, the fact that the USGS model is still incomplete; that Defendants have not committed to undertake a system-wide evaluation of the impacts of their discharges into impaired waters or to specify BMPs that will be used to ensure water quality standards will be met in those waters; that they have only committed to dates certain for the evaluation of four waterways across their entire system; that they do not intend to install structural BMPs to address existing water quality problems absent a new construction project; and that they are proposing to do no remediation at the Three Sites.

Defendants' unrebutted failure to provide a revised SWMP that adequately addresses its ongoing Clean Water Act violations both defies the Court's Findings and Rulings and prolongs the harm they are doing to the Commonwealth's waterways.

Plaintiffs accordingly request that the Court withhold its approval of Defendants' Revised SWMP and enter the Proposed Order.

### A. Mr. Schueler's Expert Analysis Confirms That The Revised Storm Water Management Plan Fails to Comply With the Court's Findings and Rulings and The Requirements of The MS4 Permit

Mr. Schueler's analysis of the Revised SWMP confirms that Defendants' proposed BMPs remain inadequate. In its Findings and Rulings, the Court found that Defendants are violating:

> (1) Part I.b.2.k of the General Permit because its SWMP lacks "an adequate description of the BMPs that will be used" to prevent instream exceedances of water quality standards, (Findings and Rulings, May 30, 2008 (hereafter cited as "Tr., Findings") 6:25-7:4);
>
> (2) Part I.C.2 of the General Permit because the Revised SWMP neither includes "the structural, as opposed to the programmatic, best management practices that [Defendants intend] to use to control the discharge of pollutants of concern" nor an "approach to measuring the effectiveness of such best management practices. And it must." (Tr., Findings 8:3-8.);
>
> (3) Part I.2.D.3 of the General Permit because Defendants have not adequately assessed whether, with respect to all waters for which a TMDL has been established, appropriate control measures have been taken and additional measures are necessary, (Tr., Findings 9:2-8); and
>
> (4) Part I.2.D.4 of the General Permit because Defendants have not adequately recorded all measures being implemented to control pollutants of concern identified in TMDLs as well as " a schedule of implementation for all planned controls with respect . . . to specific total maximum daily load reports." (Tr., Findings 9:19-24.)

Mr. Schueler's conclusions after reviewing both the Revised SWMP and Defendants' January 29, 2010 submission are that neither adequately addresses any of these violations. With respect to I.b.2.k, Mr. Schueler found that the Revised SWMP lacks any description of BMPs that <u>will be used</u> to control pollutants of concern because all of the proposed compliance measures Defendants characterize as BMPs either are not

4

structural or appear to be "elective, optional or discretionary." (Ex. 1, Schueler Report 1, at 1-2.) As to Defendants' I.C.2 violations, Mr. Schueler found that not only are none of the proposed BMPs "structural [BMPs] that could physically reduce pollutant loads from new or existing MassHighway projects," but "actual pollutant reduction" by the proposed BMPs cannot be "measured, modeled, or verified." (Id. at 1-3). With regard to I.2.D.3, Mr. Schueler found that "there is virtually no change in the recommended actions within the TMDL watersheds from previous versions of the same table." (Id. at 4.) Furthermore, and with respect to all general permit violations, Mr. Schueler's concluded that there is no concrete schedule for assessment of impaired waterways and BMP implementation. (Id. at 5.) Mr. Schueler further notes that only two of the proposed BMPs in the Revised SWMP could be considered "new", and that "none of the new or revised BMPs proposed by MassHighway . . . can be considered in any meaningful sense an effective water quality BMP." (Id. at 6). All of Defendants' proposed compliance measures appear to be optional, none are structural, and there is no clear indication of funding for any of the proposed BMPs. (Id. at 5-6.)

      To briefly recap the major deficiencies:  there are no descriptions of structural BMPs or methods for measuring the effectiveness of BMPs delineated in the plan, there are absolutely no deadlines for the implementation of any structural BMPs despite the Court's five year implementation timeframe and; at least for the foreseeable future, Defendants have arbitrarily limited the universe of waterways to be evaluated for additional BMPs to a subset of final TMDLs, despite the Court's clear ruling that it must address impaired waterways under Parts I.b.2.k and I.C.2 of the Permit as well as TMDL

waterways under Part I.D.3-4.³ In sum, the Revised SWMP falls short in every category ordered by the Court for revision and, therefore, Plaintiffs request that the Court not approve the Revised SWMP as submitted and instead require Defendants to revise the SWMP to comply with the Court's May 30, 2008 rulings and provide the additional relief specified in Plaintiffs' proposed Order.

### B. The AECOM Report Should Be Disregarded As Contrary to The Court's Findings and Rulings and, In the Alternative, Because the Report's Analysis Is So Significantly Flawed That Its Conclusions Are Unreliable.

Rather than providing a remediation plan for the Three Sites as the Court ordered, the Revised SWMP relies on a consultant's report by Defendants' consultant, AECOM, (Appendix J) stating that no remediation is warranted. The Court should disregard this report as filed in derogation of its Findings and Rulings. The Court clearly ruled that, based on the evidence presented at trial, there were occasional instream exceedances of water quality standards at the Three Sites in violation of Section 1.b.2.k of the MS4 permit and that Defendants must remediate the unlawful discharges. (Tr., Findings 5:6-16, 6:19-24, 11:25-12:15).⁴ The Court specifically stated that Defendants should not come back in the end of December 2009 and say otherwise. (Id. at 17:5-11.) This, however, is exactly what they have done. Therefore, Plaintiffs move to have the AECOM report stricken from the record and request that the Court order Defendants to prepare a remediation plan for the Three Sites, as required in its Findings and Rulings.

---

³ See Tr., Findings, at 6-7 (regarding I.B(2)(k) and I.C.), 8-9 (regarding I.D.3-4).
⁴ The Court also found, as noted in Plaintiffs' Opposition Motion, that Defendants violated this section of the permit by failing to identify BMPs that would be used to ensure that instream exceedances of water quality standards do not occur – a problem the AECOM report does nothing to redress. (See Pls. Opp. Motion at 6n.9.)

In the alternative, even if the Court were to consider the AECOM report, Mr. Schueler unequivocally finds that significant flaws in the AECOM analysis make its conclusions unsupportable. As detailed in Exhibit 2, the AECOM BMP model is defective in three key respects.[5] First, it makes the unwarranted assumption that the only runoff to be considered comes from a hypothetical design storm produced by 3.3 inches of rainfall. (Id. at 4.) The model therefore effectively and unjustifiably ignores the runoff from 120 to 150 storms that typically occur during such a three year period, and the pollutants discharged during such storms. (Id., at 5.) Second, it assumes that the existing, decades-old drainage structures, which were designed to control flooding and do not effectively address pollutant discharge, are in fact BMPs that remove pollutants of concern. (Id. at 5-6.) Finally, the AECOM model incorrectly assumes that these outdated drainage structures are so effective that where the drainage from a portion of the highway drainage system "does not exceed the pre-development peak discharge rate for three year design storm, then that entire area draining to them can be excluded from the ensuing water quality model analysis." (Id. at 6-7.) This assumption entirely ignores the increased volume of discharge containing pollutants of concern due to development. (Id.)

Ultimately, Mr. Schueler concluded that "the output of the AECOM models cannot be trusted to infer any conclusions or be used as the basis for any stormwater management decisions." (Id. at 1). In his expert opinion, the AECOM modeling framework that Defendants commissioned and submitted to the Court is an "egregious example[] of 'stacking the deck' to arrive a pre-ordained conclusion." (Id.) Indeed, the AECOM model is so fatally flawed and biased as to be useless, and Defendants' reliance

---

[5] Because AECOM's BMP model is so fundamentally skewed, Mr. Schueler did not go on to assess any deficiencies in its water quality model. (Ex. 2 Schueler Report, at 4.)

upon it in defiance of the Findings and Rulings is simply indefensible. On this basis as well, Plaintiffs move to have the AECOM report stricken from the record, and request that the Court order Defendants to prepare a remediation plan for the Three Sites, as required in its Findings and Rulings.

### C. Defendants' January 29, 2010 Submission Serves Only to Underscore the Deficiencies Identified in Plaintiffs' Opposition Brief and Mr. Schueler's Expert Analysis

Defendants' January 29, 2010 submission confirms many of the problems identified in Plaintiffs' Opposition Motion. As noted above, Defendants acknowledge that not only have they failed to incorporate the USGS report and model into their Revised SWMP, but furthermore there is no assurance it will even be available this year. (See Def. Status Report, dated January 29, 2010 at 4n.6). Defendants reiterate that they do not currently plan to remediate the exceedences of water quality standards the Court found to be occurring at the Three Sites (Id. at 5), and again fail to identify a single structural BMP that will be implemented to control pollutants of concern or a concrete date by which any proposed remediation measures will be implemented. In their Status Report, Defendants admit they will leave a large proportion of their 18,000 outfalls -- those that are known to discharge into impaired waters without a final TMDL -- un-evaluated and unaddressed for the foreseeable future. (Id. at 6-8.)

Defendants concede that the Findings and Rulings require them to assess the need for and effectiveness of BMPs for <u>all</u> impaired waters, rather than simply those for which a TMDL has been established. (See Def. Status Report at 9). Yet they provide no specifics on how this will be done and expressly admit that the Revised SWMP does not address this requirement. (Id. at 9 ("Once MassDOT completes its review of waters with

8

final TMDLs, it intends to apply a . . . prioritized process to assessing BMPs for impaired waters where TMDLs have not yet been developed. . . While this effort is not currently described in the [Revised SWMP], MassDOT proposes to expand BMP 7R in the Plan to include this effort."))

Defendants also implicitly indicate that they have no real intention of evaluating the effectiveness of BMPs to control pollutants of concern, despite the Court's Findings and Rulings. Rather, they assert that "DEP has indicated that BMPs designed and constructed in accordance with [DEP] policy have presumed pollutant removal effectiveness as stated in the Policy." (Defs. Status Report, January 29, 2010, at 12.) This, Defendants argue, is in keeping with I.2.D.3 of the General Permit. (Id.) As a threshold matter, compliance with the state stormwater policy is not the legal standard in this case. The Permit is issued by the U.S. Environmental Protection Agency ("EPA") Region 1, and is a federally-enforceable National Pollutant Discharge Elimination System ("NPDES") Permit; federal law, not a state agency's interpretation thereof, controls. On a practical level, Defendants' murky reference to the state stormwater policy does not give any meaningful effect to the Court's Finding that Defendants are required under the General Permit, section I.C.2, to provide an approach to measuring the effectiveness of their BMPs. (Tr., Findings and Rulings, 8:2-8.) Even if the state stormwater policy did have legal bearing on compliance with Section I.C.2 of the Permit, which it does not, Defendants assume without justification that current BMPs were

designed and implemented in accordance with DEP policy, where the AECOM report shows that this is likely not the case.[6]

The Court has already found that Defendants are in violation of I. D.3 because they have "not adequately assessed whether appropriate measures are being met through existing storm water control measures and [have] not determined whether additional control measures are necessary." (Tr., Findings and Rulings, 9:1-8.)  Defendants' January 29, 2010 Status Report defies this Finding, conceding that Defendants intend only to evaluate a small sub-set of waterways with a TMDL utilizing a discretionary method to screen out a large proportion (63%) of TMDL waterways prior to the assessment of whether existing control measures are sufficient and whether additional control measures are necessary.  (See Ex. 1, Schueler Report 1, at 4-5.)  Additionally, as briefed in Plaintiffs' Opposition Motion, MHD's illegitimate narrowing of TMDL waterways it plans to evaluate is predicated on a state program that "has never been finalized, and was premised on different environmental objectives than the MS4 program" – a point Defendants choose to ignore. (Opp. Mot. at 13 n.15, 14 n.18.)

In lieu of making any concrete commitment to implementing structural BMPs, Defendants repeatedly assert that they are continuing to study the problem or that "efforts are ongoing." (See e.g. Defs. Status Report at 3 ("it is important to emphasize that MassDOT's efforts are ongoing. . ."), 6 ("MassDOT's efforts outlined in the [Revised SWMP] are ongoing.")  Merely providing repeated assurances that studies, analysis, and planning will continue does not meet the legal requirements of the Permit and Findings

---

[6] Mr. Schueler's report concludes that the existing drainage features characterized as water quality BMPs in the AECOM report do not even comply with MassHighway's own guidance or with MassDEP policy. (Ex. 2, Schueler Report 2, at 2, 6-7).

10

and Rulings and indicates that Defendants are still failing to implement remedies to protect the waters of the Commonwealth, in violation of Court order.

Mr. Schueler's expert reports reveal significant concerns about Defendants' approach that will remain applicable even if and when the USGS model is completed and Defendants use this model to evaluate the impact of their discharges and the need for additional structural BMPs. He found that:

> [W]hile the forthcoming (an long awaited) USGS highway contaminant model will undoubtedly be a superior tool to conduct the TMDL watershed assessments, it is still subject to manipulation using unfounded technical assumptions about BMP performance. Quite simply, future USGS modeling analysis may arrive at a similar (but incorrect conclusions) if the same BMP analysis methods used by AECOM are still employed. Therefore, it should be incumbent on MassHighway to develop a transparent, peer-reviewed and scientifically credible model to more accurately predict the effect of structural BMPs and retrofits in reducing the delivery of pollutants of concern into the receiving waters of the State.

(Ex. 2, Schueler Report 2, at 7.)

Therefore, given the flawed BMP analysis methodology put forth by Defendants in their Revised SWMP, and the three site evaluation, Plaintiffs seek the opportunity to review and evaluate any BMP analysis methodology proposed by Defendants going forward as part of their compliance with the Findings and Rulings in this case.

### D. The Court Should Ignore Defendants' Blatant Attempts at Misdirection

In their January 29, 2010 filing, instead of seriously addressing the deficiencies identified in Plaintiffs' Opposition Motion, Defendants attempt to misdirect the Court's attention by improperly emphasizing funding constraints and attempting to shift blame for their inadequate Revised SWMP to Plaintiff CLF. With respect to the former,

funding constraints are no excuse for continuing violation of federal law.[7] See Ohio Valley Envt'l Coalition v. Horinko, 279 F. Supp.2d 732, 748 (W. Va. 2003) ("The desire to preserve and focus state resources is a permissible goal under the EPA's regulations, but that goal must be implemented in a manner consistent with the regulations' minimum requirements"); Conservation Law Found, of New England v. Metro. Dist. Comm'n, Civ. A. Nos. 85-0489-MA, 83-1614-MA, 1985 WL 9071 at *15-16 (D.Mass. Sept. 5, 1985) (expense and un-popularity of requisite construction waste treatment facilities does not bear on a state agency's obligation to conform to NPDES permit requiring their construction). MassDOT's continued delay and obfuscation of compliance with permit requirements merely "enlarges the problem and means an even more expensive and prolonged effort." Metro. Dist. Comm'n, 1985 WL 9071 at *16. Indeed, as indicated in the Opposition Motion, if Defendants' compliance with the Findings and Rulings continues at this pace, it would take between forty and one hundred years to complete evaluation of impaired waters, let alone implementation of structural BMPs as required by the Permit." (Pls. Opp. Motion at 17 (emphasis omitted).)

Moreover, the Commonwealth has been on notice since 1999 that it would be required to undertake measures to control polluted storm water runoff. Had Defendants taken these obligations been seriously, they would have had plenty of time to incorporate infrastructure investments into multi-year planning processes.[8] Stormwater Phase II Rule,

---

[7] Plaintiffs note that the Commonwealth of Massachusetts is a Defendant in this case, and is responsible for ensuring that appropriate resources are directed toward compliance. S
[8] Plaintiffs do not concede the validity of Defendants' unsubstantiated assertions that the Commonwealth's ability to make legally required storm water infrastructure improvements is limited by transportation funding processes. (See Defs. Status Rept., Jan. 29, 2010, at 11.)

12

64 Fed. Reg. at 68722-24 (December 8, 1999) (Regulations effective February 7, 2000; initial outreach began in 1992).

Defendants' attempt to blame their deficient submissions on CLF is no more than a last-ditch effort at misdirection. Over the past year and a half, Plaintiffs diligently sought to fulfill their obligation to consult with Defendants to promote compliance with the Court's Findings and Rulings. To this end, Plaintiffs initiated all requests for status conferences and provided written correspondence both seeking clarification on Defendants' position regarding specific compliance requirements as well as providing Plaintiffs' view of the actions required under the Court's Findings and Rulings.[9] (See e.g. Ex. 3 at 2-5 (CLF Nov. 6 and Dec. 17, 2008 Letters); Ex. 3 at 6 (CLF April 13, 2009 letter)). Further, Plaintiffs diligently attempted throughout this post-trial period to seek pertinent information about Defendants' planned compliance activities, including reports and other relevant documents, in order to provide timely review and comment on the work being done by Defendants as it progressed. (See Pls. Mot. Status Conf., Dkt No. 87). In contrast, Defendants failed to even notify the Court when it became apparent that the deadlines for both the USGS Report and Model were slipping.[10] This failure to

---

[9] Defendants correctly point out that during the parties' April 2009 meeting, the idea was raised that CLF would identify scientists to provide independent opinions regarding the forthcoming AECOM report and retrofit opportunities; however Plaintiffs had requested copies of the USGS draft report and draft AECOM report before proceeding with this proposal. (See Dkt No. 87, Ex. 1, at 2.) Defendants disclosed to Plaintiffs a conclusory, 6 page draft report summary from AECOM in late May, 2009 that did not provide a sufficient basis on which to proceed.

[10] Defendants affirmatively chose not to notify the Court or the Plaintiffs in August, 2008 when MassHighway and the Executive Office of Transportation authorized a year-long extension for completion of the USGS Report, extending the deadline to December 31, 2009, rather than December 31, 2008 as represented at trial. See Ex. 4, MassHighway-USGS Correspondence; compare Defs. Status Rept., Jan. 29, 2009 at 4 n.6.

13

communicate critical delays was not only counter to the Court's direction, but further hindered a candid consultation process between the parties. This failure to notify the Court appears directly to contravene the Court's ruling that "if we're going to miss any of these deadlines, I want a report as to why, and it may require hearings." Findings and Rulings, at 11:7-8 (May 30, 2008). In addition, by their own admission, Defendants did not provide Plaintiffs with the Draft USGS Report or complete AECOM report until October, 2009.[11] (Status Report at 2 n.4.)

Finally, Defendants' suggestion that CLF had ample time to review their Revised SWMP before it was filed on December 23, 2009 is simply untrue. Defendants did not provide Plaintiffs with their proposed Revised SWMP until November 23, 2009. Plaintiffs took pains to expeditiously review this 385 page technical document in an extremely short time frame and provided Defendants with a written summary of its deficiencies on December 14, 2009. (See December 14, 2009 letter.) No changes appear to have been made to the SWMP submitted to the Court on December 23, 2010 that indicate Defendants incorporated any of Plaintiffs' comments and concerns.

## II. CONCLUSION

Defendants' Revised SWMP and January 29, 2010 and the record before the Court make clear that Defendants have directed significant efforts since trial to undermining, rather than complying with, this Court's Findings and Rulings. Compliance with the Clean Water Act and the Court's rulings is not discretionary. Nor

---

[11] This fact belies Defendants' unjustified assertion that they used the AECOM model only because they received "no response" from CLF. (Status Report at 9.) More importantly, Defendants argument offers no real defense of their continued reliance upon a fatally flawed model to justify continued defiance of this Court's Findings and Rulings. Defendants are alone answerable for their refusal to comply with this Court's order and rectify their unlawful behavior.

are parties free to controvert a trial court's findings of fact by hiring consultants post facto to question those findings using egregiously flawed analyses.

In conclusion, for all the reasons stated above, Plaintiffs therefore respectfully request that the Court reject the Revised SWMP, compel Defendants' compliance with the Findings and Rulings, and enter the Proposed Order (attached as Exhibit 5).

Respectfully submitted,

CONSERVATION LAW FOUNDATION, LEOMINSTER LAND TRUST,
AND CHARLES RIVER WATERSHED ASSOCIATION
Plaintiffs, by their Attorney,

/s/ Cynthia E. Liebman
Cynthia E. Liebman (BBO# 665528)
Conservation Law Foundation, Inc.
62 Summer Street
Boston, Massachusetts 02110
Telephone: (617) 350-0990 x744
CLiebman@clf.org

Dated: March 1, 2010

Certificate of Service:

I hereby certify that a copy of this Memorandum was served on all parties registered through the Court's electronic filing system.

/s/ Cynthia E. Liebman

Dated March 1, 2010